FILED

JAN - 9 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

TJ

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re:

JEFFREY W. and LAURIE D. SWENSON,

Debtors.

Case No. 05-33004-C-7

Chapter 7

Adv. Proc. No. 05-02530-C✓

UNITED STATES OF AMERICA,

Plaintiff,

v.

JEFFREY W. SWENSON; LAURIE D.
SWENSON; WARREN E. SWENSON; and
VICKY L. SENELLA,

Defendants.

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**

**INTRODUCTION**

On December 30, 2005, the Plaintiff, United States of America,  filed its Complaint to

deny a discharge to the Defendants Jeffrey and Laurie Swenson, to deny a discharge of

certain taxes, and to prevent Warren and Vicky Swenson from dissipating the debtors' personal

residence at 2809 Club Drive, Rocklin, California, during the pendency of this proceeding. An

answer was filed and over a period of time, discovery was conducted and this matter was set

1   for trial in the above entitled Court. In addition, Gerald Ainsworth, the Trustee in Bankruptcy for

2   Jeffrey and Laurie Swenson filed a separate Adversary Proceeding No 07-02083 on April 9,

3   2007 seeking a judgment compelling Warren Swenson and Vicky Senella (the Debtors' father

4   and step- mother) to turn over the real property at 2809 Club Drive; for a judgment declaring

5   that the Trustee, on behalf of the Bankruptcy Estate, holds 100% of both the legal and

6   equitable title to the 2809 Club Driver property; and for such other relief as the court seems

7   proper. During the trial the Trustee alleged that certain evidence against Warren Swenson and

8   Vicky Senella shows what amounts to a fraudulent transfer.

9           The trial commenced and took place on October 1-2, 2007. At the beginning of the trial

10  all parties and counsel agreed that both adversary proceedings (05-2530 and 07-2083) would

11  be consolidated procedurally in that all evidence received by witnesses, by declarations, and

12  by written documents, would be considered in both adversary proceedings and the Court's

13  Findings of Fact and Conclusions of Law and Judgments would be prepared and entered

14  separately. Any Conclusions of Law herein that are more properly characterized as Findings of

15  Fact, shall be treated as Findings of Fact. Any Findings of Fact herein that are more properly

16  characterized as Conclusions of Law, shall be treated as Conclusions of Law.

17          At the close of trial the Court ordered that the parties, through their counsel, prepare and

18  submit their proposed Findings of Fact and Conclusions of Law for the Court to review and

19  consider. In addition, the Court ordered that each party would have two weeks to prepare and

20  submit their objections to the Findings prepared by the opposing parties. This was completed

21  and the Court has read each proposed finding and each objection submitted by the parties.

22  The Court has also considered the transcript of the proceedings and the Court's own

23  recollection of the testimony of the parties who testified. As was pointed out to the parties at

24  the close of the testimony, it seemed that the burden of proof in this case would be extremely

25  important. All parties agreed that the Plaintiffs had the burden on all of the issues set forth in

26  the complaints and the burden of proof is by a preponderance of evidence standard.

27  //////

28  /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURISDICTION**

The Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. Jurisdiction exists pursuant to 28 U.S.C. §1334. Venue is proper under 28 U.S.C. §1409 (a) The District Court has generally referred these matters to the Bankruptcy Court for hearing pursuant to 28 U.S.C. §157(a) and United States District Court, Eastern District of California, General Orders 182 and 223. This is a core proceeding within the meaning of 28 U.S.C. 157(b)(2)(A)(E)(H)(I)(J) & (O). The specific issues raised are set forth in the Conclusions of Law.

**FINDINGS OF FACT**

**I.    Procedural Background**

1.    Debtors Jeffrey and Laurie Swenson ("debtors") presently reside at 2809 Club Drive Road, Rocklin, California ("Club Drive Residence").

2.    On September 28, 2005, debtors filed their Voluntary Petition under Chapter 7 of the United States Bankruptcy Code (11 U.S.C.) with this Court.

3.    This is debtors' second bankruptcy filing under Chapter 7; their first petition was filed on August 19, 1994, with the U.S. Bankruptcy Court for the Central District of California. See October 1, 2007, Trial Transcript ("10/1 Trial Tr.") at 111:5-9; see also US Ex. 32, Alternate Direct Testimony of IRS Revenue Officer Charles E. Duff ("Duff Direct") at ¶ 58.

4.    On December 30, 2005, the United States filed the instant adversary complaint against debtors seeking an adjudication and determination of the following claims:

(i) that debtors' tax debts for tax years 1993 through 2004 are excepted from discharge, pursuant to 11 U.S.C. § 523(a)(1)(C), because they willfully attempted to evade or defeat such tax;

(ii) that debtors' personal residence, although titled in the names of nominee relatives, is in fact owned by debtors and constitutes property of the bankruptcy estate;

(iii) that, pursuant to 11 U.S.C. § 727(a)(2), debtors' discharge should be denied

1   because debtors concealed ownership of their personal residence from creditors, including the

2   United States;

3   (iv) that, pursuant to 11 U.S.C. § 727(a)(4), debtors' discharge should be denied

4   because debtors made a false oath in omitting their personal residence from their schedules;

5   (v) that, pursuant to 11 U.S.C. § 507(a)(8), debtors' tax liabilities for tax years

6   2002, 2003, and 2004, constitute non-dischargeable priority claims because such liabilities

7   concern taxable years for which a return was due three (3) years before the date of the filing of

8   debtors' bankruptcy petition; and

9   (vi) that defendants Warren Swenson and Vicky Senella be enjoined from

10  dissipating debtors' personal residence during the pendency of this proceeding.

11  5.    On May 3, 2006, the Internal Revenue Service ("IRS") filed a Proof of Claim

12  identifying the federal income tax liabilities assessed against debtors for tax years 1993

13  through 2004 inclusive, among other federal tax liabilities.  See US Ex. 13, IRS Proof of Claim

14  (as amended on May 9, 2006).

15  6.    A bench trial of this matter was conducted on October 1, 2007, and October 2,

16  2007.

17  7.    The United States and defendants Warren Swenson and Vicky Senella

18  separately presented their direct cases through alternate direct testimony (as required by the

19  Court's June 5, 2007 Order in this case and Local Rule 9017-1), live testimony, and exhibits.

20  The debtors chose not to file their  alternate direct testimony and exhibits with the Court relying

21  on the government to prove their case by the appropriate burden of proof.

22  **II.    Relationships of the Defendants**

23  8.    Debtors Jeffrey Swenson and Laurie Swenson are husband and wife.

24  9.    Defendants Warren Swenson and Vicky Senella are husband and wife.

25  10.   Warren Swenson is Jeffrey Swenson's father.

26  11.   Vicky Senella is Laurie Swenson's sister.

27  **III.   Debtors' Tax History**

28  12.   As of October 1, 2007, the first day of trial in this case, debtors' federal income

-4-

tax liabilities (Form 1040) for tax years 1993 through 2004 inclusive (hereinafter, the "tax years at issue") totaled $981,249, including accrued statutory interest.  See US Ex. 32, Duff Direct at ¶ 5.

### A.    *Non-Payment & Non-Compliance*

13.    During the tax years at issue, Jeffrey Swenson owned and operated a successful carpet installation business, although they had some problems, intentional or otherwise, in paying all their bills including tax bills.   The debtors reported adjusted gross income in excess of $1.1 million.  See US Ex. 1, Forms 4340, Certificates of Assessments, Payments, and Other Specified Matters for Jeffrey W. & Laurie D. Swenson for federal income taxes (Form 1040) for tax years 1993 through 2004 ("Forms 4340"); see also US Ex. 32, Duff Direct at ¶ 6 (chart).

14.    Debtor Laurie Swenson was previously employed as a retail clerk, but she has not been employed since 1994.  See October 2, 2007, Trial Transcript ("10/2 Trial Tr.") at 3:15-16.

15.    Other  than four or five payments under $400.00, the Debtors did not make any *other*  voluntary payments towards their federal tax debts during the twelve tax years at issue, and they have yet to pay any of the balance of their huge reported liabilities.  See US Ex. 32, Duff Direct at ¶ 6.

16.    In addition, debtors late-filed eight out of the twelve income tax returns due for this period. Id.

17.    Debtors' pattern of late-filing their federal income tax returns is continuing.  For example, debtors have not yet filed their 2005 return, which was required (under an extension) to be filed by October 15, 2006. Id. at ¶ 5.

18.    At all relevant times, debtors have been aware of the duty to file tax returns and the deadlines for doing so.  See 10/1 Trial Tr. at 134:23-135:10; see also US Ex. 32, Duff Direct at ¶ 6.

19.    Debtors are aware that they are required to pay the full amount of taxes reported as due on the tax return at the time of filing.  See 10/1 Trial Tr. at 136:13-19.

20.    At times, debtors have chosen not to read letters received from the IRS about their federal income tax liabilities. Id. at 139:16-19.

-5-

21.    At times, debtors have chosen not to read transmittal letters sent by their tax return preparer, Gary Wurst. Id. at 141:2-4. Among other things, these transmittal letters advise the debtors to "review the [income tax] returns carefully to ensure that there are no omissions or misstatements of material facts." See, e.g., US Ex. 21, 2003 Income Tax Return (Form 1040).

22.    Because he is self-employed, Jeffrey Swenson is required to make estimated tax payments throughout the year. See US Ex. 32, Duff Direct at ¶ 7. However, Jeffrey Swenson made no such payments during the tax years at issue (involving 48 consecutive quarterly periods). Id.

23.    Jeffrey Swenson is aware that, because he is self-employed, he is required to make estimated tax payments. See 10/1 Trial Tr. at 138:2-6. Despite this knowledge, at times Jeffrey Swenson has failed to make estimated tax payments .. Id. at 138:11-20.

24.    At times, Jeffrey Swenson admits that he has kept almost no business records. Id. at 138:25-139:2.

25.    During the tax years at issue, Laurie Swenson was principally responsible for managing debtors' financial affairs, which included maintaining the checkbook for debtors' personal checking account at Wells Fargo Bank. 10/2 Trial Tr. at 7:23-8:15; see also US Ex. 29, Debtors' Check Register.

26.    During the tax years at issue, Laurie Swenson also participated in the preparation of debtors' federal income tax returns. For example, she assisted her husband in gathering receipts. See 10/2 Trial Tr. at 18:13-14. She also wrote at least one letter to debtors' tax return preparer (Gary Wurst) in which she described in detail debtors' tax information, including her husband's various business expenses. Id. at 19:24-20:7, 20:21-24; see US Ex. 39, Letter to Gary Wurst from Laurie Swenson.

27.    In the letter, Laurie Swenson advised the tax return preparer that debtors had not paid any estimated quarterly taxes for the year. See US Ex. 39, Letter to Gary Wurst from Laurie Swenson; 10/2 Trial Tr. at 21:13-18.

28.    Laurie Swenson testified that she has been aware of the tax problems "as long as they have been there." See 10/2 Trial Tr. at 3:17-25.

-6-

**B.    Federal and State Audits of Jeffrey Swenson's Business**

29.    In or around 1999, the IRS audited Jeffrey Swenson's business operations for tax years 1995 and 1996.  The audit resulted in the assessment of taxes due in excess of what debtors reported on their income tax returns, as well as accuracy-related penalties.  Specifically, the IRS made the following assessments against debtors:

| Tax Year | Assessment Amount/Type | Assessment Date |
|----------|-----------------------|-----------------|
| 1995 | $78,224.00 (add'l tax) $15,644.80 (§6662 penalty) | 04/05/1999 |
| 1996 | $72,220.00 (add'l tax) $14,444.80 (§6662 penalty) | 02/22/1999 |

See US Ex. 32, Duff Direct at ¶ 7.

30.    The California Franchise Tax Board also audited Jeffrey Swenson's business operations for tax years 1995 and 1996 in or around 1999, resulting in proposed tax deficiencies.  See US Ex. 28, FTB Notices of Proposed Assessments.

31.    During the federal and state audits, debtors were renting a property in Roseville, California in the name of Jeffrey Swenson's father, defendant Warren Swenson.  See 10/1 Trial Tr. at 114:15-20, 118:11-119:20.

**C.    Overstatement of Business Expenses**

32.    Jeffrey Swenson's costs of labor as reported on Schedule C of debtors' 2001 income tax return ($20,419) substantially exceeded the amount he reported to the IRS on Forms 1099 ($12,687).  See US Ex. 32, Duff Direct at ¶ 11; see also US Ex. 4, 2001 Income Tax Return (Form 1040).

33.    On Schedule C of debtors' 2002 income tax return, Jeffrey Swenson reported costs of labor totaling $91,985.  However, the IRS has no Forms 1099 on file indicating that Jeffrey Swenson paid any such labor costs in 2002.  See US Ex. 32, Duff Direct at ¶11; see also US Ex. 5, 2002 Income Tax Return (Form 1040).

**D.    Unreported Gambling Income**

34.    During tax years 2000, 2002, and 2003, Jeffrey Swenson's gambling winnings

(Form W-2G) from betting on horse races totaled approximately $8000.  See US Ex. 14, Information Reporting Program ("IRP") Statements for Tax Years 2000, 2002, and 2003.

35.     Although these winnings were required to be reported on the "other income" line of debtors' federal income tax returns, debtors did not report them.  See US Exs. 3, 5, and 6, 2000, 2002, and 2003 Income Tax Returns (Forms 1040); see also US Ex. 32, Duff Direct at ¶ 66.

36.     Debtors are aware that they are required to report certain gambling winnings on Form W-2G to the IRS.  10/1 Trial Tr. at 152:18-24.  Debtors have been aware of this requirement since at least 2001, during which they reported Form W-2G gambling winnings on their federal income tax return.  Id. at 153:9-12; see also US Ex. 4, 2001 Income Tax Return (Form 1040).

### E.     $600 Offer-in-Compromise

37.     On August 28, 2002, debtors submitted an Offer-in-Compromise in the amount of $600 to the IRS to settle their outstanding tax liabilities for 1992 through 2001.  See US Ex. 32, Duff Direct at ¶15.  As of August 31, 2002, debtors' tax liabilities for these years totaled $698,995.  Id.

38.     In connection with its review of the offer-in-compromise, the IRS discovered that debtors had claimed home mortgage interest and property tax deductions for the Club Drive Residence totaling $34,540 on their 2001 income tax return, even though the Collection Information Statement (Form 433) enclosed with debtors' offer and signed under penalty of perjury failed to identify any real property assets.  Id. at ¶16.

39.     The IRS returned debtors' Offer-in-Compromise for non-compliance because at that time (i) debtors had not submitted, or obtained an extension to file, their income tax return for tax year 2002, and (ii) debtor Jeffrey Swenson had failed to pay his estimated tax obligations for each quarter of tax year 2002 and the first quarter of tax year 2003.  Id. at ¶17

40.     Based on their income and expense profile, the IRS also determined that debtors were able to pay significantly more towards their tax liabilities than the $600 they offered.  Id. at ¶18.

/ / / / /

### F.    State and Federal Tax Levies

41.    On July 10, 2000, the California Franchise Tax Board issued to Warren Swenson an "Order to Withhold Personal Income Tax Effective for One Year." See US Ex. 38, FTB Letter; 10/1 Trial Tr. at 211:8-14.

42.    The levy order instructed Warren Swenson to deduct and withhold "25% of any payment due or to become due to Jeffrey Swenson during the period the order is in effect." See US Ex. 38, FTB Letter.

43.    The California Franchise Tax Board determined that Warren Swenson made payments to Jeffrey Swenson in the amount of $77,022.63 during the effective period of the levy order. Id.

44.    Warren Swenson did not make any payments in response to the state levy order during the period the order was in effect (i.e., July 31, 2000, to January 1, 2001). Id.; see also 10/1 Trial Tr. at 211:15-17.

45.    As a result, on April 16, 2001, the California Franchise Tax Board advised Warren Swenson by letter that he had failed to honor the state levy order, and that he was personally liable for the required payment amount. See US Ex. 38, FTB Letter; 10/1 Trial Tr. at 210:25-211:5.

46.    On January 27, 2005, IRS Revenue Officer Charles Duff ("Revenue Officer Duff") issued a Notice of Levy to Warren Swenson to collect any earnings due to Jeffrey Swenson for application to the tax years at issue. US Ex. 32, Duff Direct at ¶ 52; see also US Ex. 10, Notice of Levy to Warren Swenson.

47.    According to the Notice of Levy, the total amount of federal taxes owed by debtors at that time was $840,312. See US Ex. 10, Notice of Levy to Warren Swenson.

48.    Warren Swenson received the levy on or about February 3, 2005. See US Ex. 32, Duff Direct at ¶ 52; 10/1 Trial Tr. at 201:15-202:11.

49.    The first step that Warren Swenson took in response to the levy was to talk to his son, Jeffrey Swenson. See 10/1 Trial Tr. at 202:20-204:10.

1

50.    Warren Swenson understood that he should take money out of Jeffrey Swenson's check in response to the levy and pay it over to the IRS. See Id. at 202:16-19.

2

51.    For purposes of responding to the levy, Warren Swenson represented to the IRS that Jeffrey Swenson earned $2500.00 in "salary" each month. See US Ex. 10, Notice of Levy at US00190.

3

4

5

52.    Prior to the levy, Jeffrey Swenson had never earned a salary for work performed for his father; instead, he had earned compensation as an independent contractor. See 10/1 Trial Tr. at 205:12-18.

6

7

8

53.    Warren Swenson represented that Jeffrey Swenson earned $2500 per month because it was his intention to have Jeffrey Swenson only make the amount necessary for him to pay the Club Drive mortgage. Id. at 205:19-207:21.

9

10

11

54.    Therefore, for purposes of responding to the IRS levy, Warren Swenson arbitrarily limited Jeffrey Swenson's jobs so that he would earn no more than $2500 per month. Id. at 207:25-208:3.

12

13

14

55.    Warren Swenson admits that Jeffrey Swenson could have earned $2500 on a weekly basis if he had allowed him to do more work. Id. at 208:4-9.

15

16

56.    Using Jeffrey Swenson's capped salary of $2500 per month, Warren Swenson determined that he was required to pay over $333.33 per month to the IRS in response to the levy. Id. at 208:10-23; see also US Ex. 10, Notice of Levy to Warren Swenson at US00190.

17

18

19

57.    Ultimately, Warren Swenson made only one levy payment to the IRS for $333.33. See US Ex. 32, Duff Direct at ¶ 53.

20

21

58.    Warren Swenson ceased making further levy payments to the IRS because he decided that $2500 per month was not enough money to pay his son. See 10/1 Trial Tr. at 208:24-209:7.

22

23

24

59.    Warren Swenson resumed paying Jeffrey Swenson in full for work he performed within a month of the Notice of Levy. Id. at 209:8-11.

25

26

60.    Jeffrey Swenson was aware that his father was served with the Notice of Levy. Id. at 159:6-8.

27

28

61.    Jeffrey Swenson also understood that his father made only one levy payment to

-10-

the IRS. Id. at 159:14-160:12.

62.    Based on check images he obtained from Wells Fargo Bank, which showed that debtors deposited over $22,000 in checks written from the account of and signed by Vicky Senella between September 13, 2004, and October 25, 2004, Revenue Officer Duff concluded that Jeffrey Swenson was receiving compensation from his step-mother. See US Ex. 32, Duff Direct at ¶¶ 51, 54.

63.    Therefore, on March 29, 2005, Revenue Officer Duff served a Notice of Levy upon Vicky Senella to collect any earnings due to Jeffrey Swenson for application to the tax years at issue. Id. at ¶ 54; see also US Ex. 11, Notice of Levy to Vicky Senella.

64.    Revenue Officer Duff served the Notice of Levy via certified mail, and it was signed for as received on March 31, 2005. See US Ex. 11, Notice of Levy to Vicky Senella at US00194.

65.    On April 5, 2005, the IRS received Vicky Senella's response to the Notice of Levy. See US Ex. 32, Duff Direct at ¶ 55.

66.    Vicky Senella did not include any levy payments at that time or at any time thereafter. Id.

67.    Instead, Vicky Senella stated in the "Remarks" section of the Notice of Levy that Jeffrey Swenson "have [sic] never worked for me, or anyone else ever." See US Ex. 11, Notice of Levy to Vicky Senella at US00193.

**IV.    Debtors' Spending Habits During the Tax Years at Issue**

68.    During the tax years at issue, debtors spent money that could have been used to pay their increasing federal tax liabilities on leisure activities and other discretionary expenses.

**A.    *Gambling* et. al.**

69.    Debtors began living in Palmdale, California in the early 1990s. See 10/1 Trial Tr. at 111:10-15.

70.    During the Palmdale years, Jeffrey Swenson gambled on horse races at an off-track wagering facility. Id. at 141:5-6, 10-12.

71.    Also during the Palmdale years, Jeffrey Swenson gambled on sporting events. Id. at 141:8-9. When asked at trial about the kinds of sports he liked to bet on at the time, Jeffrey

Swenson responded, "[a]ll of it." Id. at 142:10-11.

72.    Jeffrey Swenson took three or four trips to Las Vegas every year to gamble while debtors were living in Palmdale. Id. at 141:13-142:3

73.    Debtors moved from Palmdale to the Sacramento area in mid-1997. Id. at 114:15-17.

74.    Jeffrey Swenson continued to gamble on horse races after debtors moved to the area. Id. at 142:18-20.

75.    In addition, Jeffrey Swenson continued to bet on sporting events after moving to the Sacramento area. See, e.g., US Ex. 29, Debtors' Check Register at 6 (reflecting a check entry for $236 for "Dad, Rams bet").

76.    Jeffrey Swenson primarily placed bets on horse races at Cal Expo, which has an off-track betting facility. See 10/1 Trial Tr. at 142:23-143:1; 143:4-5.

77.    On one occasion at Cal Expo, Jeffrey Swenson allegedly won $4900 on a $12 bet. Id. at 143:6-143:19. Instead of paying the $4900 to the IRS, he used most of the winnings for further gambling. Id. at 143:20-144:16.

78.    During his years in the Sacramento area, Jeffrey Swenson testified that he also gambled at Thunder Valley Casino (Lincoln, California), Peppermill Reno Hotel Casino (Reno, Nevada), Harrah's Lake Tahoe (Stateline, Nevada), and MontBleu Resort Casino (formerly Caesars Tahoe, in Reno, Nevada). Id. at 144:18-145:15.

79.    Between April 24, 2000, and July 25, 2006, Jeffrey Swenson and/or Laurie Swenson made cash withdrawals in excess of $39,000 from ATM machines located at Cal Expo, Thunder Valley Casino, Peppermill Reno Hotel Casino, Harrah's Lake Tahoe, MontBleu Resort Casino, and Grand Sierra Resort & Casino (Reno, Nevada). See US Ex. 15, Debtors' Wells Fargo Checking Account Statements; see also US Ex. 16, Summary of ATM Withdrawals.[1]

---

[1]    At trial, the Court took judicial notice of the addresses of the facilities identified in this paragraph. See 10/1 Trial Tr. at 10:5-6. The names and/or addresses of facilities are identified in the descriptions of the corresponding ATM withdrawals in debtors' checking account statements. See US Exs. 15 and 16. In light of the evidence at trial, the Court also takes judicial notice of the fact that these facilities sponsor gambling activities.

80.    Based upon Jeffrey Swenson's testimony that he gambled at these facilities, and in the absence of any credible evidence to the contrary, the Court infers that most, if not all, of the cash from these ATM withdrawals was used by Jeffrey Swenson and/or Laurie Swenson for gambling activities.

81.    During the tax years at issue, Laurie Swenson gambled with her husband at the track and casinos. See 10/1 Trial Tr. at 151:23-152:4; 10/2 Trial Tr. at 14:12-15-15:18.

82.    For example, Laurie Swenson confirmed that, at times, she personally withdrew cash at ATM machines at the "track" (presumably Cal Expo) in order to gamble with her husband during the tax years at issue. See 10/2 Trial Tr. at 14:16-15:16; see also US Ex. 29, Debtors' Check Register, at 21.

83.    Laurie Swenson believed her husband's gambling activity was hurting the family finances while debtors were living in Palmdale. See 10/2 Trial Tr. at 12:15-13:24.

84.    Laurie Swenson was aware that her husband's gambling activities resumed after they moved to northern California. Id. at 14:8-9.

85.    Debtors have continued to gamble during the pendency of this bankruptcy proceeding, which debtors initiated on September 28, 2005. See 10/1 Trial Tr. at 146:10-14.

86.    For example, in 2005 and 2006, Jeffrey Swenson had Form W-2G gambling winnings in the amounts of $7,391 and $2,348, respectively. See US Ex. 14, IRP Statements; US Ex. 32, Duff Direct at ¶ 64.

87.    Also, between October 13, 2005, and July 25, 2006, Jeffrey Swenson and/or Laurie Swenson made cash withdrawals in excess of $3000 from ATM machines at Cal Expo and Thunder Valley Casino. See US Ex. 16, Summary of ATM Withdrawals.

88.    The full extent of debtors' gambling activities during tax years 1993 through 2006 cannot be determined from records directly available to the United States because (i) the IRS does not maintain reports of Form W-2G gambling winnings for tax years prior to tax year 2000, (ii) entities that sponsor betting on horse races are generally not required to report taxpayer winnings below a threshold amount, and (iii) there is no reporting requirement for gambling losses. See US Ex. 32, Duff Direct at ¶ 65.

89.    In addition, debtors failed to produce bank account statements for the period prior to January 2000 in response to the government's document requests in this case.  See US Ex. 15, Wells Fargo Checking Account Statements.

90.    Based on debtors' testimony regarding their record-keeping practices, the Court assumes that debtors misplaced or lost these and other relevant financial records.  See 10/1 Trial Tr. at 139:3-15.

91.    Also, Jeffrey Swenson routinely wrote checks from debtors' Wells Fargo account without making a corresponding entry in debtors' check register.    See 10/2 Trial Tr. at 17:5-25.

92.    Based on Jeffrey Swenson's claim that his gambling activity declined after moving to northern California, it is presumed that he gambled even more  during the Palmdale years (i.e., from 1993 to mid-1997). See 10/1 Trial Tr. at 142:15-17.

**B.    Golfing**

93.    While debtors were living in Palmdale, Jeffrey Swenson played golf two to three times per week. Id. at 153:16-154:8.  He was also a member of a golf club for which he had to pay dues of approximately $200 per month. Id. at 154:9-20.

94.    Jeffrey Swenson has continued to play golf once every ten days to every two weeks (depending on the season) since moving to the Sacramento area. Id. at 154:21-155:3. He is currently a member of the Whitney Oaks golf club. Id. at 155:4-8.

95.    Since moving to the area, Jeffrey Swenson has also played at a number of other golf courses, including Wood Creek, Diamond Oaks, Turkey Creek, and Timber Creek. Id. at 155:9-17; see also US Ex. 17, American Express ("AMEX") Statements (reflecting examples of Jeffrey Swenson's various golf expenditures during 2001).

**C.    Carribean Cruise**

96.    During tax year 2001, debtors went on a Carribean cruise that cost in excess of $6000. See US Ex. 17, AMEX Statements, at 30,36; 10/1 Trial Tr. at 155:21-157:2; 10/2 Trial Tr. at 6:21-7:10.

**D.    Discretionary Household Expenses**

97.    Debtors' residence at Club Drive in Rocklin has a below-ground pool. See 10/2

Trial Tr. at 3:6-10.

98.     At times during the tax years at issue, debtors have paid a "pool service" company to maintain the pool on a monthly basis. Id. at 8:20-9:5.

99.     Debtors' check register indicates that this pool service costs between $47 and $82 per month. See, e.g., US Ex. 29, Debtors' Check Register, at 55 (Check No. 1463 for "Walters Pool Serv." for $46.98), 62 (Check No. 1554 for "Walters Pool Serv." for $81.85), and 63 (Check No. 1563 for "Walters Pool Serv." for $70.00).

100.    At times during the tax years at issue, Debtors have paid for lawn and/or landscaping services for the Club Drive Residence. See 10/2 Trial Tr. at 9:6-9; see, e.g., US Ex. 29, Debtors' Check Register, at 68 (Check No. 1706 for "Gomez Lawn & Maint" for $150), 70 (Check No. 1775 for "Gomez Lawn & Garden" for $150), 71 (Check No. 1814 for "Gomez Lawn & Maint" for $215).

### E.     Extensive Use of Cash

101.    Based on their bank account statements, debtors made extensive use of cash during the tax years at issue. See US Ex. 15, Wells Fargo Checking Account Statements. For example, debtors' account statements for the period from September 24, 2002, to September 23, 2003, reflect ATM and bank withdrawals of cash in excess of $60,000 during this year-long period (or approximately $5,000 per month on average). Id. at 109-182.

### V.     Debtors' Use of Accounts/Assets in the Names of Close Relatives and Other Third Parties

102.    Throughout the tax years at issue, debtors have exclusively used and/or owned accounts and assets that were held for their benefit in the names of close relatives and other third parties.

### A.     Palmdale Residence

103.    Jeffrey Swenson acquired the debtors' prior residence in Palmdale, California with his mother's ex-husband, James Calderon. See 10/1 Trial Tr. at 111:16-19.

104.    Although Mr. Calderon's name was on the title and home loan as part owner, he did not contribute anything to the purchase price of the property, and Jeffrey Swenson testified that he (i.e., Jeffrey Swenson) actually owned all of the Palmdale residence. Id. at 111:20-112:12.

-15-

105.    Debtors deducted the mortgage interest for the Palmdale residence on their tax returns in order to reduce their tax liabilities. Id. at 112:13-18.

### B.    Warren Swenson's Checking Account

106.    Warren Swenson maintained a business checking account in his name with Bank of America while he was living in southern California. Id. at 213:19-20, 214:14-17.

107.    When he moved to the Sacramento area, Warren Swenson left the checking account to Jeffrey Swenson to use exclusively for his own purposes. Id. at 214:23-25.

108.    Jeffrey Swenson wrote bad checks from Warren Swenson's account. Id. at 213:20-23.

### C.    Automobiles

109.    While debtors were living in Palmdale, they leased a 1993 Nissan Pathfinder in Warren Swenson's name. Id. at 134:18-20.

110.    While debtors were living in Rocklin, they leased a 1999 Jeep Cherokee in Warren Swenson's name and made payments directly to the lender (Wells Fargo) from their bank account. Id. at 133:21-134:14; 10/2 Trial Tr. 16:25-17:2; see also US Ex. 32, Duff Direct at ¶¶ 45-46.

### D.    American Express Credit Card

111.    During 2001, debtors used an American Express credit held in the name of defendant Vicky Senella for their personal expenses. See US Ex. 17, AMEX Statements; see also 10/2 Trial Tr. at 5:21-23.

112.    The total amount charged by debtors on Vicky Senella's credit card for the period from approximately January 2001 through December 2001 was in excess of $26,000. US Ex. 17, AMEX statements; see also US Ex. 32, Duff Direct at ¶ 76.

## VI.    Debtors' Ownership of Club Drive Residence

113. Based on the evidence in this trial, the Court concludes that Debtors Jeffrey W. and Laurie D. Swenson own the Club Drive Residence. (See the Courts Introduction to this document)

### A.    Acquisition of the Club Drive Residence

114.    Defendants Warren Swenson and Vicky Senella acquired legal title to the Club Drive Residence in their names on September 7, 1999, pursuant to a grant deed, which was

-16-

recorded on September 22, 1999. See US Ex. 30, Grant Deed.

115. On July 10, 2003, debtors' power-of-attorney represented to Revenue Officer Duff that debtors owned the Club Drive Residence up through 2001, after which they sold the property to Warren Swenson. See US Ex. 32, Duff Direct at ¶¶ 30-33. This statement, which was made on debtors' behalf in response to an IRS notice of levy issued on June 18, 2003, Id., is false based on the evidence received at trial.

116. The $240,000 purchase price for the Club Drive Residence was 100% secured by two mortgage deeds of trust. See US Ex. 31, Final Closing Statement; 10/1 Trial Tr. at 185:7-9.

117. Warren Swenson's son, Eric Swenson, arranged the "no money down" financing with the lender. See 10/1 Trial Tr. at 185:22-24.

118. Warren Swenson and Vicky Senella applied for and received owner-occupied financing based on their representation that they would occupy the property within sixty days and continue to occupy the property as their principal residence for at least one year. See US Ex. 36, 1999 Deed of Trust, at 3.

119. Warren Swenson and Vicky Senella did not occupy the Club Drive Residence within sixty days as required by the covenants in the deed of trust. Id.; 10/1 Trial Tr. at 199:1-3. In fact, they have never occupied the property as their personal residence. See 10/1 Trial Tr. at 199:4-6.

120. The only costs associated with the acquisition of the Club Drive Residence were the closing costs, which totaled approximately $3335. See US Ex. 31, Final Closing Statement.

121. Debtors visited the Club Drive Residence and communicated their approval of the property to Warren Swenson and Vicky Senella prior to the acquisition of legal title. See 10/2 Trial Tr. at 22:14-23:8.

## B. Debtors' Actual and Anticipated Liabilities at the Time

122. At the time Warren Swenson and Vicky Senella acquired legal title to the Club Drive Residence, debtors' federal income tax liabilities for tax years 1993 through 1998 totaled $487,645, including accrued statutory interest. See US Ex. 32, Duff Direct at ¶ 25.

123. Between February and April of 1999, as a result of audit examinations of Jeffrey Swenson's business, the IRS assessed approximately $180,000 in additional taxes and

-17-

1  penalties against debtors for tax years 1995 and 1996. Id. at ¶¶ 8, 26.

2  124.  The California Franchise Tax Board was also auditing Jeffrey Swenson's business
3  in or around 1999, which resulted in proposed tax deficiencies. See US Ex. 28, FTB Notices of
4  Proposed Assessments.

5  125.  Debtors were aware of both the federal and state tax audits prior to the acquisition
6  of the Club Drive Residence (i.e., while they were living in Roseville, California). See 10/1 Trial
7  Tr. at 115:21-24, 118:11-119:20.

8  126.  On April 15, 1999, approximately five months before the acquisition of the Club
9  Drive Residence, debtors were required to report their federal income tax liability of $118,456 for
10  tax year 1998. See US Ex. 32, Duff Direct at ¶¶ 27-28.

11  127.  However, debtors did not file their 1998 tax return reporting this liability until March
12  8, 2001. Id. at ¶ 27; see also US Ex. 1, Form 4340 for Tax Year 1998.

13  ## C.  Re-Financing of the Mortgage

14  128.  On or about September 24, 2002, Warren Swenson and Vicky Senella re-financed
15  the Club Drive Residence by executing a deed of trust as security for an owner-occupied
16  mortgage in the amount of $280,000. See US Ex. 37, 2002 Deed of Trust.

17  129.  Warren Swenson and Vicky Senella represented in the deed of trust that they
18  would occupy the property within sixty days and continue to occupy the property as their
19  principal residence for at least one year. Id. at 3.

20  130.  However, Warren Swenson and Vicky Senella did not occupy the property as their
21  personal residence within sixty days or at any time thereafter. See 10/1 Trial Tr. at 200:2-6.

22  131.  Debtors Jeffrey Swenson and Laurie Swenson paid for the $475 appraisal of the
23  Club Drive Residence in connection with the re-finance. See 10/2 Trial Tr. at 24:16-26:14; US
24  Ex. 29, Debtors' Check Register, at 65; US Ex. 15, Wells Fargo Checking Account Statements,
25  at 110.

26  132.  The proceeds of the re-finance ($48,950.35) were deposited into Vicky Senella's
27  Wells Fargo bank account on October 21, 2002. See Def. Ex. P, Wells Fargo Account
28  Statement ending November 20, 2002; Def. Ex. U, Alternate Direct Testimony of Warren
Swenson, at ¶ 8.

1    133.   Although this bank account is held in Vicky Senella's name, Warren Swenson
2    considers it to be his business account, and he uses it for that purpose. See 10/1 Trial Tr. at
3    212:19-25.

4    134.   All of Jeffrey Swenson's earnings come through this account. Id. at 225:21-23;
5    see also 10/2 Trial Tr. at 10:8-10.

6    135.   After the re-finance, debtors continued to pay the mortgage, albeit for a changed
7    amount as a result of the new loan. See 10/2 Trial Tr. at 10:11-24.

8

9    **D.    Debtors' Exclusive Use and Enjoyment of the Property**

10   136.   Debtors have continuously and exclusively resided in the Club Drive Residence
11   since its acquisition in September 1999. See 10/1 Trial Tr. at 119:14-20, 199:4-6.

12   137.   Debtors have been responsible for paying the mortgage, property insurance, and
13   property taxes for the Club Drive at all relevant times. Id. at 121:12-123:20.

14   138.   On many occasions, debtors submitted the mortgage payments for the Club Drive
15   Residence directly to the mortgage company using their personal checking account. See 10/2
16   Trial Tr. at 10:1-5; US Ex. 29, Debtors' Check Register.

17   139.   Warren and Vicky have not put any equity of their own into the Club Drive
18   Residence. See 10/1 Trial Tr. at 185:20-21.

19   140.   Since the property was acquired in 1999, debtors have been responsible for
20   making all the necessary repairs to the property. Id. at 127:17-19.

21   141.   Debtors are also responsible for maintaining the pool, which they have done with
22   the assistance of a pool man. Id. at 127:22-128:1; 10/2 Trial Tr. 8:23-9:8.

23   142.   Debtors are responsible for maintaining the landscaping. See 10/2 Trial Tr. at 9:6-
24   9.

25   **E.    Debtors' Tax Treatment of the Residence**

26   143.   Debtors claimed home mortgage interest and state property tax deductions
27   ("property deductions") for the Club Drive Residence on their tax returns for tax years 2000-
28   2004, which reduced their taxable income during these years. See US Exs. 3-7, Debtors'

1 Federal Income Tax Returns for 2000-2004 (Forms 1040).

2     144. Debtors' property deductions for the Club Drive Residence for tax years 2000-
3 2004 totaled approximately $129,000. Id.; see also US Ex. 32, Duff Direct at ¶ 60.

4     145. Debtors reported the home mortgage interest for tax years 2000-2004 on
5 Schedule A of their tax returns as "home mortgage interest not reported to [them] on Form
6 1098." US Exs. 3-7, Debtors Federal Income Tax Returns for 2000-2004 (Forms 1040).

7     146. Debtors further reported that the mortgage interest was paid to Warren Swenson
8 "as the person from whom [they] bought the [Club Drive Residence." Id.

9     147. Debtors attested to the truthfulness, accuracy, and completeness of the tax returns
10 for tax years 2000-2004 under penalty of perjury. Id.

11     148. Debtors' tax returns for tax years 2000-2004 were prepared by Gary Wurst, the
12 owner and operator of a tax preparation and bookkeeping service in Santa Clarita, California.
13 See US Ex. 40, Alternate Direct Testimony of Gary L. Wurst ("Wurst Direct") at ¶ 2. Mr. Wurst
14 charged debtors a standard flat fee of between $145 and $155 for the preparation of each tax
15 return. Id. at ¶ 11.

16     149. Mr. Wurst prepares tax returns for individual clients, like debtors, based only upon
17 information provided by such clients or others acting on their behalf. Id. at ¶ 5. After the tax
18 return is prepared, Mr. Wurst sends the returns to the client for their signature, along with
19 instructions on how to file it with the IRS. Id. The instructions also advise the client to review
20 the return(s) to ensure that there are no factual omissions or misstatements before filing. Id.

21     150. Mr. Wurst regularly prepares federal income tax returns for clients that report
22 itemized deductions for home mortgage interest and property taxes on Schedule A of the return.
23 Id. at ¶ 7. Mr. Wurst testified at trial that he will not report these deductions for a client unless
24 he has information establishing that they are entitled to such deductions. Id. For purposes of
25 reporting client deductions for home mortgage interest and property taxes, Mr. Wurst generally
26 relies on the amounts stated on IRS Forms 1098. Id.

27     151. Mr. Wurst began preparing federal and state tax income returns for debtors in the
28 early 1990s, during which time they were living in Palmdale, California. Id. at ¶ 8.

152.    Mr. Wurst began preparing federal and state income tax returns for Warren Swenson in the 1960s. Id.

153.    In or around late 1999 or early 2000, Warren Swenson advised Mr. Wurst that he and his wife, Vicky Senella, had recently taken title to the Club Drive Residence in their names, but on behalf of the debtors as a result of debtors' alleged bad credit. Id. at ¶ 9.

154.    During this conversation, Warren Swenson represented that debtors were the owners of the Club Drive Residence and, as such, they would exclusively occupy the property, and they alone would be legally responsible for paying all of the mortgage expenses on the property and the property taxes. Id. at ¶ 10.

155.    During this conversation, Warren Swenson also stated that he would provide Gary Wurst with copies of home mortgage interest statements (Forms 1098) so that he could report home mortgage interest and property tax deductions for the Club Drive Residence on debtors' federal tax returns. Id.

156.    Consistent with Warren Swenson's representations, Mr. Wurst included itemized deductions for home mortgage interest and property taxes paid by Jeffrey and Laurie for the Club Drive Residence on Schedule A of debtors' tax returns for 2000-2004. Id. at ¶ 13. He obtained the mortgage interest and property tax amounts from Forms 1098 that Warren Swenson sent to his office. Id.

**F.    Warren Swenson & Vicky Senella's Tax Treatment of the Residence**

157.    After Warren Swenson and Vicky Senella acquired legal title to the Club Drive Residence in September 1999, nearly five years passed before Warren Swenson asked Gary Wurst to prepare his federal income tax returns for 1999, 2000, 2001, 2002, and 2003. See Defendants' Exhibit U, Alternate Direct Testimony of Warren Swenson, at ¶ 18.

158.    Mr. Wurst did not report rental income nor depreciation deductions for the Club Drive Residence on Warren Swenson's federal income tax returns, which is consistent with what Mr. Wurst had been told regarding debtors' ownership of the Club Drive Residence. See US Ex. 40, Wurst Direct at ¶ 14.

-21-

1    159.    Currently, the IRS does not have federal income tax returns on file for Warren

2   Swenson for tax years 2000, 2001, 2002, and 2005. See US Ex. 32, Duff Direct at ¶ 61.

3    160.    The federal income tax returns on file for Warren Swenson for tax years 2003 and

4   2004 do not report any rental income from any source on Schedule E of such returns. Id.

5    161.    On Schedule B of Warren Swenson's 2004 tax return, he reported the receipt of

6   $19,624 in seller-financed mortgage interest from Jeffrey Swenson, who he reported as the

7   buyer. See US Ex. 27, Warren Swenson's 2004 Federal Income Tax Return (Form 1040). This

8   matches the amount that debtors reported on Schedule A of their 2004 tax return for the

9   payment of mortgage interest on the Club Drive Residence. See US Ex. 7, Debtors' 2004

10  Federal Income Tax Return (Form 1040).

11   162.    The tax returns on file with the IRS for Vicky Senella for tax years 2000 through

12  2004 inclusive do not report any rental income from any source on Schedule E of such Returns.

13  See US Ex. 32, Duff Direct at ¶ 63.

14

15       **G.    Rental Arrangement/Agreement**

16   163.    At trial, debtors and their co-defendants, Warren Swenson and Vicky Senella,

17  argued that the Club Drive Residence was "rented" to debtors pursuant to a purported rental

18  agreement. As a procedural matter, the agreement is not before the Court because the parties

19  did not introduce, nor propose to introduce, the document into evidence during trial. However,

20  the Court is able to make the following factual findings based on the record before it: (See the

21  Courts Introductory statements at the beginning of this document.)

22   164.    The purported rental agreement is dated May 1, 2002, which is nearly three years

23  after the purchase of the Club Drive Residence. See US Ex. 32, Duff Direct at ¶ 41.

24   165.    Debtors stated that their former tax consultants proposed the creation of the

25  purported rental agreement. See 10/1 Trial Tr. at 131:17-20; 10/2 Trial Tr. at 22:10-12.

26   166.    On September 17, 2003, debtors produced the purported rental agreement at a

27  mandatory meeting with Revenue Officer Duff pursuant to earlier-issued IRS summonses. See

28  US Ex. 32, Duff Direct at ¶ 41.

1      167.   At the meeting, debtors alleged that they had never owned the Club Drive
2   Residence, but rather paid the mortgage, mortgage interest, and property taxes under the terms
3   of the purported rental agreement.

4   **VII.    Debtors' Bankruptcy Petition, Schedules, and Testimony**

5      168.   The Court has reviewed debtors' bankruptcy petition dated September 5, 2005,
6   and the attached schedules, including Schedule A (Real Property), Schedule J (Current
7   Expenditures of Individual Debtor), and the Statement of Financial Affairs. See US Ex. 12,
8   Bankruptcy Petition and Schedules.

9      169.   Debtors attested to the truthfulness and correctness of their bankruptcy petition,
10   schedules, and Statement of Financial Affairs under penalty of perjury. Id.

11      170.   Schedule A requests a list of "all real property in which the debtor has any legal,
12   equitable, or future interest . . ." In response to this request, debtors stated "NONE." Id.

13      171.   Schedule J requests an estimate of debtors' average expenses.  Among other
14   expenses, debtors listed $2618 for "rent or home mortgage payment."  The schedule further
15   asks if real estate taxes and property insurance are included in this payment.  Debtors marked
16   the "NO" box for both items. Id.

17      172.   Debtors have been responsible for paying the property insurance and taxes for the
18   Club Drive Residence at all relevant times. See 10/1 Trial Tr. at 121:12-123:20.

19      173.   Item No. 2 of the Statement of Financial Affairs requests a statement of "income
20   received by the debtor other than from employment, trade, profession, or operation of debtor's
21   business during the two years immediately preceding the commencement of [the bankruptcy
22   case]." In response to this item, debtors checked "NONE." See US Ex. 12, Bankruptcy Petition
23   and Schedules.

24      174.   Jeffrey Swenson received Form W-2G gambling income totaling $2,267 in tax year
25   2003 and $7,391 in tax year 2005. See US Ex. 14, IRP Statements.

26      175.   Item No. 8 of the Statement of Financial Affairs requests a list of "all losses from
27   fire, theft, other casualty or gambling within one year immediately preceding the commencement
28   of [the bankruptcy case]." In response to this item, debtors checked "NONE." See US Ex. 12,

-23-

1 | Bankruptcy Petition and Schedules.

2 |     176.   Jeffrey Swenson and/or Laurie Swenson made cash withdrawals in excess of
3 | $3000 from ATM machines at Cal Expo and Thunder Valley Casino between September 29,
4 | 2004 and August 26, 2005. See US Ex. 16, Summary of ATM Withdrawals, at 13.

5 |     177.   On November 14, 2005, the first meeting of creditors in debtors' bankruptcy case
6 | was held, and Revenue Officer Duff appeared on behalf of the IRS. See US Ex. 32, Duff Direct
7 | at ¶ 82.

8 |     178.   At the meeting of creditors, Jeffrey Swenson testified under oath that debtors have
9 | no ownership interest in the Club Drive Residence. Id.

10 |

11 | **CONCLUSIONS OF LAW**

12 | I.   **Burden of Proof**

13 |     179.   The United States bears the burden of proof with respect to each of its claims in
14 | this case.

15 |     180.   At trial, the government presented evidence in support of its claims under the
16 | following sections of the Bankruptcy Code (11 U.S.C.): § 727(a)(2)(A) (concealment of estate
17 | property), § 727(a)(4)(A) (false oath), and § 523(a)(1)(C) (willful tax evasion).

18 |

19 |     181.   The government also presented evidence in support of its claim that the Club
20 | Drive Residence constitutes property of the bankruptcy estate based on certain "nominee"
21 | factors.

22 |     182.   For each of these claims, the burden of proof is the preponderance of the
23 | evidence standard. See, e.g., In re Lawler, 141 B.R. 425, 428-29 (9th Cir. BAP 1992) (holding
24 | that the preponderance of the evidence standard applies in cases arising under § 727(a)(2)(A)
25 | and 727(a)(4)(A)); Grogan v. Garner, 498 U.S. 279, 284-86 (1991) (holding that the same
26 | standard applies in cases arising under § 523(a)(1)(C)); United States v. Reed, 168 F. Supp. 2d
27 | 1266, 1268 (D. Utah 2001) (holding that the same standard applies for nominee claims).

28 |     183.   "The burden of showing something by a 'preponderance of the evidence,' the most

1    common standard in civil law, 'simply requires the trier of fact "to believe that the existence of a
2    fact is more probable than its nonexistence before [he] may find in favor of the party who has
3    the burden to persuade the [judge] of the fact's existence."'" Concrete Pipe & Prods. of Cal., Inc.
4    v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (quoting In re Winship,
5    397 U.S. 358, 371-72 (1970) (brackets in original) (citation omitted).

6    After listening to all the oral testimony and reading all of the declarations and exhibits, it
7    became abundantly clear that the Government and the Trustee proved their case by a
8    preponderance of evidence.  If the Burden had been "beyond a reasonable doubt" the Plaintiffs
9    in each case would have still  been successful.

10   **II.    Objection to Discharge for Concealing Estate Property [11 U.S.C. § 727(a)(2)(A)]**

11   184.    The Bankruptcy Code provides that the Court shall grant a Chapter 7 debtor a
12   discharge unless "the debtor, with intent to hinder, delay, or defraud a creditor . . . has . . .
13   concealed . . . property of the debtor, within one year before the date of the filing of the petition."
14   11 U.S.C. § 727(a)(2)(A).

15   185.    The United States has met its burden of proof, by a preponderance of the
16   evidence, that debtors' bankruptcy discharge should be denied pursuant to 11 U.S.C. §
17   727(a)(2)(A) because they intentionally hindered, delayed, or defrauded their creditors, including
18   the United States, by concealing their ownership of the Club Drive Residence within one year
19   before the filing of their bankruptcy petition.

20   186.    An objection to discharge under § 727(a)(2)(A) is deemed to consist of two
21   elements: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective
22   intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the
23   property." Hughes v. Lawson, 122 F.3d 1237, 1240 (9th Cir. 1997).

24   ***A.    Concealment Requirement***

25   187.    The United States Court of Appeals for the Ninth Circuit has adopted the
26   "continuing concealment" doctrine, which provides that the requisite act of concealment may
27   occur more than one year prior to the bankruptcy filing so long as the debtor has retained a
28   'secret benefit of ownership' in the subject property within the year prior to filing.  See Hughes,

-25-

1    122 F.3d at 1240-41 (citing In re Olivier, 819 F.2d 550, 555 (5th Cir. 1987)).

2         188.    For purposes of § 727(a)(2)(A), a debtor may be found to have continuously

3    concealed property where title is acquired in the name of a third party, but the debtor

4    continuously enjoys, pays for, and otherwise controls the use and benefit of the property

5    thereafter and within the year prior to his bankruptcy filing. See, e.g., Keeney v. Smith, 227 F.3d

6    679, 682-84 (6th Cir. 2000) (debtor found to have retained secret ownership interest in property

7    acquired in his parents' names).

8         189.    In this case, the acquisition of the Club Drive Residence in the names of Warren

9    Swenson and Vicky Senella on September 7,1999 – although more than one year prior to the

10   filing of debtors' bankruptcy petition – satisfies the "concealment" element of

11   § 727(a)(2)(A) because the evidence at trial establishes that debtors continuously retained a

12   secret benefit of ownership in the property after that date and within the year prior to filing of

13   their bankruptcy petition.

14        190.    Debtors' ownership interest in the Club Drive Residence is "secret" to the extent

15   they failed to disclose it on their bankruptcy schedules. This "secret" has not been well-

16   guarded, however – as evidenced by the fact that Warren Swenson advised his trusted tax

17   preparer of forty years, Gary Wurst, that debtors were the owners of the property in all material

18   respects.

19        191.    Since the property was acquired, debtors have also (i) exclusively resided in the

20   property; (ii) paid the mortgage, property insurance, and property taxes; (iii) claimed home

21   mortgage interest and property tax deductions as the property owners on their federal income

22   tax returns for five consecutive tax years (2000-2004); (iv) made all the necessary repairs; and

23   (v) paid for the pool and lawn maintenance.

24        192.    In addition, all of the equity in the Club Drive Residence belongs to debtors

25   because neither Warren Swenson or Vicky Senella put any money towards the purchase price,

26   and debtors have continuously paid the mortgage (including the increased payment after the re-

27   finance in 2002). In fact, Warren Swenson admitted at trial that he has no equity whatsoever in

28   the property. Thus, it is beyond dispute that debtors have retained a secret benefit of ownership

1 ┃ in the property.

2 ┃     193.   Each of the defendants in this case insists that debtors have always "rented" the
3 ┃ Club Drive Residence from Warren Swenson.  The Court finds this defense to be seriously
4 ┃ lacking in credibility and rejects it for the following reasons:

5 ┃     (i)     as an objective matter, the arms-length indicia of a rental arrangement are non-
6 ┃ existent based on the trial record;

7 ┃     (ii)    Warren Swenson never reported any rental income or depreciation deductions on
8 ┃ his federal income tax returns, which, it bears noting, he did not attempt to have prepared for
9 ┃ nearly five years after the Club Drive Residence was acquired;

10 ┃     (iii)   Warren Swenson and Vicky Senella twice applied for and received owner-
11 ┃ occupied loans for the property (as opposed to investment-grade loans, which would have
12 ┃ allowed the use of the property as a rental);

13 ┃     (iv)   the purported written rental agreement between debtors and Warren Swenson, a
14 ┃ copy of which was never offered by the defendants at trial, is apparently dated nearly three
15 ┃ years after the Club Drive Residence was acquired;

16 ┃     (v)    the creation of this agreement, in turn, was proposed by debtors' tax consultants,
17 ┃ not their alleged landlord; and

18 ┃     (vi)   even in the absence of this agreement, the theory of a rental arrangement
19 ┃ between debtors and Warren Swenson is repudiated by the weight of the competing evidence at
20 ┃ trial.  While the names of debtors' relatives may appear on the title, this evidence establishes
21 ┃ that debtors have retained an otherwise absolute ownership interest in the Club Drive
22 ┃ Residence at all relevant times since its acquisition.

23 ┃

24 ┃     ***B.***     ***Intent Requirement***

25 ┃     194.   Fraudulent intent may be proven by circumstantial evidence and "inferences drawn
26 ┃ from a course of conduct."  See In re Devers, 759 F.2d 751, 753-54 (9th Cir. 1985) (recognizing
27 ┃ the utility of such evidence "because a debtor is unlikely to testify directly that his intent was
28 ┃ fraudulent").

1    195.   Certain "badges of fraud" strongly suggest that a transaction's purpose is to

2  defraud creditors.  These factors, not all of which need to be present, include:

3        (a)    a close relationship between the transferor and the transferee;

4        (b)    that the transfer was in anticipation of a pending suit;

5        (c)    that the transferor-debtor was insolvent or in poor financial condition at the time;

6        (d)    that all or substantially all of the debtor's property was transferred;

7        (e)    that the transfer so completely depleted the debtor's assets that the creditor has

8              been hindered or delayed in recovering any part of the judgment; and

9        (f)    that the debtor received inadequate consideration for the transfer.

10  See In re Woodfield, 978 F.2d 516, 518 (9th Cir. 1992); see also In re Ayala, 107 B.R. 271, 274-

11  75 (Bankr. E.D. Cal. 1989) (reciting a similar, but not identical, list that includes "the general

12  chronology of the events and transactions" as a relevant factor in the fraud inquiry").

13    196.   The "intent" element § 727(a)(2)(A) can be inferred from the circumstantial

14  evidence surrounding the acquisition of the Club Drive Residence, as well as debtors' course of

15  conduct.  The preponderance of this evidence establishes that debtors had a subjective intent to

16  hinder, delay, and defraud their creditors, including the United States, by acquiring the property

17  in the names of Warren Swenson and Vicky Senella.  For example, the following evidence is

18  indicative of debtors' state of mind:

19        (i)    debtors are very close relatives of both Warren Swenson and Vicky Senella, in

20  whose names title to the Club Drive Residence was acquired; Warren Swenson is debtor Jeffrey

21  Swenson's father, and Vicky Senella is debtor Laurie Swenson's sister;

22        (ii)   in the years leading up the purchase of the Club Drive Residence, Warren

23  Swenson had demonstrated a willingness to hold assets in his name for the exclusive use and

24  benefit of debtors, including a bank account, two vehicles, and a Roseville rental property;

25

26        (iii)   based on prior experience with their Palmdale residence, debtors believed they

27  could be the actual, unencumbered owners of real property and enjoy all the benefits of that

28  ownership (including the associated tax deductions) even if the name of a third party appeared

on the title;

-28-

(iv)    at the time Warren Swenson and Vicky Senella acquired title to the property in their names, debtors were in poor financial condition and facing serious tax issues on multiple fronts.  For example, their federal income tax liabilities at the time were approximately $500,000, which included $180,000 in audit assessments by the IRS in February and April of 1999, and they were under state audit by the California Franchise Tax Board.  At the same time, debtors were sitting on a federal income tax liability of approximately $118,000 from tax year 1998. Although this liability should have been reported on April 15, 1999, approximately five months before the acquisition of the Club Drive Residence, debtors did not file their 1998 tax return until two years later;

(v)    Warren Swenson stopped filing his own federal income tax returns for nearly five years after he and his wife acquired title to the Club Drive Residence; and

(vi)    by acquiring the Club Drive Residence in the names of their close relatives, debtors depleted their largest known collection asset and hindered the IRS and other creditors from taking collecting action on the property.

197.    Based on the preponderance of the evidence adduced at trial, the Court concludes that debtors' concealment of their ownership of the Club Drive Residence from the bankruptcy estate amounts to an intentional effort on their part to hinder, delay or defraud their creditors, including the United States.

198.    Therefore, debtors' general bankruptcy discharge is denied pursuant to 11 U.S.C. § 727(a)(2)(A).

**III.    Objection to Discharge for Making a False Oath [11 U.S.C. § 727(a)(4)(A)]**

199.    A discharge in bankruptcy may be denied in the event "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).

200.    The purpose of § 727(a)(4)(A) is "to ensure that dependable information is

supplied to those interested in the administration of the bankruptcy estate so that they can rely upon it without the need for the trustee or other interested parties to dig out these true facts in

1    examination or investigations; the opportunity to obtain a fresh start is thus conditioned upon
2    truthful disclosure." In re Martin, 88 B.R. 319, 325 (D. Colo. 1988).

3      201. The United States has met its burden of proof, by a preponderance of the
4    evidence, that debtors' bankruptcy discharge should be denied pursuant to 11 U.S.C. §
5    727(a)(4)(A) because they knowingly and fraudulently made false oaths in this case.

6      202. To prevail on a claim under § 727(a)(4)(A), the creditor must establish that (1)
7    there was a false statement under oath or penalty of perjury, (2) the false oath was made
8    knowingly and fraudulently, and (3) the false oath was related to a material fact." In re Aubrey,
9    111 B.R. 268, 274 (9th Cir. BAP 1990).

10     ***A. False Statements under Penalty of Perjury***

11     203. A material omission from the debtor's Chapter 7 schedules, or a false statement of
12   financial affairs may constitute a false oath for purposes of § 727." In re Martin, 88 B.R. at 323.
13   "A common instance of 'false oath' is when a debtor declares that the schedule of property is
14   true and correct and it appears that the debtor has knowingly and fraudulently omitted assets
15   from it." 6 Collier on Bankruptcy, ¶ 727.04[2] (15th ed. rev.); see also In re Tan, 350 B.R. 488,
16   495 (Bankr. N.D. Cal. 2006) (denying discharge under § 727(a)(4)(A) where debtor was
17   determined to have knowingly and fraudulently omitted from his bankruptcy schedules his
18   interests and positions in several closely held corporations).

19     204. Debtors attested to the truthfulness and correctness of their bankruptcy petition
20   and schedules under penalty of perjury.  Debtors also testified under oath at the November 14,
21   2005, meeting of creditors in this case.  In both contexts, however, debtors made a number of
22   false oaths that warrant the denial of their bankruptcy discharge.[2]

23     205. Debtors made a false oath by omitting the Club Drive Residence from Schedule A
24   of their bankruptcy schedules, which requires a listing of "all real property in which the debtor

---

26     [2] In its adversary complaint, the United States alleges that debtors committed a false
      oath by omitting the Club Drive Residence from their sworn bankruptcy schedules.  At trial,
27   however, the United States introduced – without objection from defendants – evidence suggesting
      that debtors committed additional false oaths.  Although the government did not seek to amend
      its complaint to conform to this evidence, the Court may amend the pleadings *sua sponte* by
28   entering findings on the unpleaded issues pursuant to Fed. R. Civ. P. 15(b) (as adopted by the
      Rules of Bankruptcy Procedure), and it does so expressly herein. See Galindo v. Stoody Co., 793
      F.2d 1502, 1512-13, n.8 (9th Cir. 1986) (citations omitted).

1   has any legal, equitable, or future interest."  They also made a false oath by denying their
2   ownership interest in the property during the November 14, 2005, meeting of creditors.  These
3   oaths are necessarily false because the evidence described herein proves that debtors are the
4   actual owners of the property in all material respects (notwithstanding the names of their close
5   relatives on the title).

6       206.   Debtors made a false oath in Schedule J of their bankruptcy schedules by failing
7   to admit that real estate taxes and property insurance are included in their "rent or mortgage
8   payment" for the Club Drive Residence.  Even if debtors dispute this Court's findings regarding
9   the nature of the ownership of the property, debtors testified at trial that they are responsible for
10  paying the real estate taxes and property insurance.  Moreover, debtors claimed property tax
11  deductions for the Club Drive Residence in their federal tax returns for tax years 2000 through
12  2004 inclusive.

13      207.   Debtors made a false oath by omitting Jeffrey Swenson's gambling income in Item
14  No. 2 of the Statement of Financial Affairs, which requests a statement of any non-business
15  income during the two years immediately prior to the commencement of the bankruptcy case.
16  The evidence at trial shows that Jeffrey Swenson received Form W-2G gambling income
17  totaling $2,267 in tax year 2003 and $7,391 in tax year 2005.  Thus, debtors committed a false
18  oath when they failed to list these amounts.

19      208.   Debtors made a false oath by failing to identify their gambling losses in Item No. 8
20  of the Statement of Financial Affairs, which requests a listing of such losses incurred within one
21  year before the commencement of the bankruptcy case.  Debtors' bank statements reflect cash
22  withdrawals in excess of $3000 from ATM machines at Cal Expo and Thunder Valley Casino
23  between September 29, 2004, and August 26, 2005, and Jeffrey Swenson testified at trial that
24  he gambles at both of these facilities.  The Court infers that debtors lost at least some
25  percentage of this amount at the horse tracks and/or casinos within the year before they filed
26  their bankruptcy petition.

27  **B.   *Knowingly and Fraudulently***

28      209.   A debtor acts "knowingly" for purposes of § 727(a)(4)(A) if he or she acts

-31-

1 | deliberately and consciously.  See In re Roberts, 331 B.R. 876, 884-85 (9th Cir. BAP 2005).

2 |     210.   Whether a debtor acts "fraudulently" for purposes of § 727(a)(4)(A) may be proven

3 | by reference to circumstantial evidence and the debtor's course of conduct, including the

4 | "badges of fraud" that may be applied to a non-dischargeability claim under § 727(a)(2)(A).  See

5 | In re Wills, 243 B.R. 58, 64 (9th Cir. BAP 1999) (citing In re Woodfield, 978 F.2d at 518-19).  The

6 | Court may also infer fraudulent intent from the debtor's reckless indifference to or disregard of

7 | the truth.  Id.

8 |             ***i.     Omission of Club Drive Residence***

9 |     211.   As discussed in connection with the United States' concealment claim under

10 | § 727(a)(2)(A), the circumstantial evidence surrounding the acquisition of the Club Drive

11 | Residence, together with debtors' continuous, uninterrupted use and enjoyment of the property

12 | since that time, demonstrates that debtors acted with the requisite intent when they omitted the

13 | Club Drive Residence from their sworn statements in this proceeding.

14 |     212.   In particular, debtors' course of conduct with the IRS, and now this Court, supports

15 | an inference that debtors acted knowingly and fraudulently (or, at a minimum, with reckless

16 | indifference of the truth) when they denied their ownership interest in the Club Drive Residence

17 | under oath.  This course of conduct finds debtors seeking to enjoy all the benefits of ownership

18 | of the Club Drive Residence, while simultaneously seeking to avoid the most significant burden

19 | of that ownership under the circumstances – namely, the threat of a forced sale to pay their

20 | debts, including a federal tax liability approaching $1 million that debtors incurred after not

21 | paying their taxes for twelve years.

22 |     213.   Illustrative of this course of conduct, debtors filed their 2000 and 2001 federal

23 | income tax returns on August 10, 2001, and August 15, 2002, respectively.  In each return,

24 | debtors enjoyed the benefits of ownership of the Club Drive Residence by reporting home

25 | mortgage interest and property tax deductions to reduce their taxable income.  In each return,

26 | debtors represented themselves as the owners under penalty of perjury.  However, on August

27 | 28, 2002, (only two weeks after they filed their 2001 tax return), debtors submitted a frivolous

28 | $600 offer-in-compromise to the IRS and failed to list the Club Drive Residence as a real

property asset in the collection information statement (which they executed under penalty of perjury).

214.    Then on July 10, 2003, in response to the IRS's increased collection efforts, debtors' power-of-attorney represented to the IRS that debtors owned the Club Drive Residence up through 2001, after which they sold the property to Warren Swenson. This statement made on debtors' behalf is objectively false based on the evidence at trial, and the Court infers that it was made for two purposes. First, it was intended to justify to the IRS the home mortgage interest and property tax deductions that debtors claimed on their 2000 and 2001 tax returns. Second, it was intended to keep the Club Drive Residence out of the cross-hairs of the IRS's collection efforts going forward. This version of events did not last for long, however.

215.    On September 8, 2003, debtors filed their 2002 federal income tax return, and they again swore to their ownership of the Club Drive Residence in order to report mortgage interest and property tax deductions. Yet in a meeting with Revenue Officer Duff a little more than a week later, on September 17, 2003, debtors claimed that they had never owned the Club Drive Residence, but rather paid the mortgage, mortgage interest, and property taxes under the terms of a purported rental agreement which they produced at that time. The fact that the rental agreement was dated three years after the purchase of the Club Drive Residence, and allegedly created at the recommendation of debtors' tax consultants, suggests a further continuation of debtors' intent to simultaneously benefit from and shield the property.

216.    Although debtors represented to the IRS that the Club Drive Residence is a "rental," this claim did not deter them from claiming tax deductions for the property on their subsequently-filed federal returns for 2003 and 2004.

217.    Failing to disclose their ownership interest the Club Drive Residence in this bankruptcy (via Schedule A or the meeting of creditors) is but the latest in a long line of conduct intended to avoid the threat of collection against the property while simultaneously enjoying all of the benefits of ownership.

### ii.    Omission of Real Estate Taxes and Property Insurance

218.    That debtors are intent on shielding the Club Drive Residence from a forced sale is

-33-

1  further illustrated by their failure to state that they pay the real estate taxes and insurance for the
2  property in Schedule J of their sworn bankruptcy schedules. Debtors testified at trial that they
3  bear these expenses, and their last five federal tax returns reported deductions for these

5  expenses. The fact that debtors swore to the contrary in Schedule J is strong circumstantial
6  evidence of fraud or, at the very least, reckless disregard of the truth.

7  ### iii.    Omission of Gambling Winnings and Losses

8  219.    The Court finds that debtors' failure to identify the gambling winnings and losses
9  that they incurred in the appropriate periods leading up to their bankruptcy filing was knowing
10  and fraudulent for purposes of § 727(a)(4)(A). Debtors' rampant gambling activities over the
11  years, particularly those of Jeffrey Swenson, were amply demonstrated at trial through debtors'
12  testimony, bank records, and IRS reports. For instance, debtor Jeffrey Swenson was reported
13  as having earned almost $10,000 in gambling income in 2003 and 2005 – most, if not all, of
14  which should have been listed in the Statement of Financial Affairs. Debtors' intentional failure
15  to report their gambling income is not without precedent either; they failed to report this income
16  on their 2000, 2002, and 2003 federal income tax returns, despite evidence establishing their
17  awareness of the legal requirement to do so. Thus, based on the trial record and the inferences
18  drawn therefrom, debtors are deemed to have possessed the requisite intent at the time they
19  omitted their gambling activity from the required schedule.

20  ### D.    Materiality

21  220.    The materiality prong under § 727(a)(4)(A) is broadly defined. In re Wills, 243 B.R.
22  at 62. A false statement (or omission) will be deemed material "if it bears a relationship to the
23  debtor's business transactions or estate, or concerns the discovery of assets, business
24  dealings, or the existence and disposition of the debtor's property." Id.

25  221.    Each of debtors' false omissions under oath in this proceeding are material
26  because they bear a close relationship to debtors' estate and their business dealings, as well as
27  to the discovery and existence of debtors' property.

28  222.    Based on the preponderance of the evidence adduced at trial, the Court concludes

1  that debtors knowingly and fraudulently made false oaths in this proceeding.

2  223.    Therefore, debtors' bankruptcy discharge is denied pursuant to 11 U.S.C. §
3  727(a)(4)(A).

4  **IV.    Exception to Discharge for Willful Tax Avoidance [11 U.S.C. § 523(a)(1)(C)]**

5  224.    A Chapter 7 debtor will be denied a discharge for "any debt . . . for a tax . . . with
6  respect to which the debtor made a fraudulent return or willfully attempted in any manner to
7  evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).

8  225.    The purpose of the § 523 exception is to limit the Bankruptcy Code's discharge of
9  tax debts to the "honest but unfortunate" debtor.  Grogan v. Garner, 498 U.S. at 286-287; In re
10 Gardner, 360 F.3d 551, 557 (6th Cir. 2004).

11 226.    The United States has met its burden of proof, by a preponderance of the
12 evidence, that debtors' federal tax liabilities for tax year 1993 through 2004 (as set forth in the
13 IRS's Proof of Claim) should be excepted from discharge to 11 U.S.C. §  523(a)(1)(C) because
14 they willfully attempted to evade or defeat such taxes by their acts and omissions.

15 227.    Courts have construed the language "attempted in any manner to evade or defeat
16 [a] tax" broadly in light of the fact that "Congress did not define or limit the methods by which a
17 willful attempt to defeat and evade might be accomplished and perhaps did not define them lest
18 its effort to do so result in some unexpected limitation."  Dalton v. IRS, 77 F.3d 1297, 1301 (10th
19 Cir. 1996) (quoting Spies v. United States, 317 U.S. 492, 499 (1943)).  Thus, courts must
20 consider the "totality of the circumstances" in determining whether § 523(a)(1)(C) should prevent
21 the discharge of debtor's tax debts.  In re Spiwak, 285 B.R. 744, 750 (S.D. Fla. 2002).

22 228.    It is well-settled that the statute applies both to attempts to defeat the assessment
23 of a tax and to attempts to defeat the payment of a tax.  In re Toti, 24 F.3d 806, 809 (6th Cir.
24 1994), cert. denied, 513 U.S. 987 (1994); United States v. Merrill, 336 B.R. 804, 808 (D. Or.
25 2005); see also In re Griffith, 206 F.3d 1389, 1392-1396 (11th Cir. 2000) (en banc) (overruling in
26 pertinent part In re Haas, 48 F.3d 1153 (11th Cir. 1995), and joining other circuits in holding that
27 a willful attempt to defeat payment of a tax renders a tax liability non-dischargeable under §
28 523(a)(1)(C)).

229.   Section 523(a)(1)(C) contains both a conduct element (*i.e.*, that the debtor sought to evade or defeat a tax liability) and a mental state element (*i.e.*, that he did so willfully).  See In re Toti, 24 F.3d at 809.

### A.   Conduct Element

230.   The conduct element can be satisfied by acts of commission or by acts of omission.  Id.; see also In re Jacobs, 490 F.3d 913, 925-27 (11th Cir. 2007) (holding that debtor's chronic late-filing of tax returns, his non-payment of the liabilities reported in those returns, his use of nominees to hold title to his personal residence and vehicles, his payments of luxury expenses such as golf memberships, among other things, supported the conduct element under § 523(a)(1)(C)); Hamm v. United States, 356 B.R. 263, 280-83 (Bankr. S.D. Fla. 2006) (holding that debtors' use of nominees to hold title to property for their benefit, extensive dealing in cash, and wrongful deductions of expenses on federal tax returns constituted affirmative acts of tax evasion for purposes of § 523(a)(1)(C)); In re Hamer, 328 B.R. 825, 834 (Bankr. N.D. Ala. 2005) (holding the conduct element satisfied where debtor earned income during the tax years at issue but did not make any estimated tax payments, had inadequate or no withholdings, and late-filed his tax returns); In re Peterson, 317 B.R. 556, 563 (Bankr. N.D. Ga. 2004) (holding the conduct element satisfied, in part, where debtor maintained substantial income during the tax years at issue, but "managed to avoid collecting any assets that could be subject to levy by the IRS for his delinquent taxes" by 'leasing' cars and 'renting' housing from a third party companion).

231.   The trial record in this case is replete with examples of debtors engaging in behavior that satisfies the "conduct" element of  § 523(a)(1)(c) during the tax years at issue (1993-2004).  Examples of this evasion conduct includes:

(i)    complete non-payment of their federal income tax liabilities during the twelve tax years at issue (despite earning adjusted gross income in excess of $1 million during this period);

(ii)   complete non-payment of their estimated tax liabilities during the twelve tax years at issue (involving 48 consecutive tax quarters);

(iii)  chronic late-filing of their federal income tax returns (*i.e.*, eight out of twelve of

-36-

1    debtors' tax returns during this period were late-filed, some by years);

2        (iv)    non-reporting of gambling income (Form W-2G) on their federal income tax returns
3    in 2000, 2002, and 2003;

4        (v)    overstatement of labors costs on their federal income tax returns in 2001 and
5    2002;

6        (vi)    luxury spending on gambling, golf, and travel, among other unnecessary
7    expenses, instead of paying their federal tax liabilities;

8        (vii)    heavy use of cash (including ATM cash withdrawals at gambling facilities in excess
9    of $39,000 between 2000 and 2006);

10        (viii)    acquiring the Club Drive Residence in the name of their close relatives
11    (defendants Warren Swenson and Vicky Senella) at a time when they were facing massive
12    federal tax liabilities resulting from their continuous non-payment, audit assessments for tax
13    years 1995 and 1996, and a self-assessed liability for tax year 1998.

14        (ix)    frequent use of nominees to hold other assets for their use and benefit, including
15    vehicles, bank accounts, and credit cards.

16        (x)    a $600 offer-in-compromise in August 2002; and

17        (xi)    conspiring with defendants Warren Swenson and Vicky Senella to obstruct the
18    IRS's levy efforts. (For example, Jeffrey Swenson was aware of these IRS efforts, but stood by
19    while his father arbitrarily pegged his "salary" far below what he actually could earn and made
20    only one levy payment on his behalf).

21        **B.    Mental State Element**

22        232.    The mental state element is established by showing the debtor (1) had a duty to
23    pay taxes, (2) knew he had such a duty, and (3) voluntarily and intentionally violated that duty.
24    In re Rowen, 298 B.R. 641, 651 (Bankr. D. Alaska 2003) (citing In re Fretz, 244 F.3d 1323, 1330
25    (11th Cir. 2001)).

26        233.    A showing of fraudulent intent is not required. Id. (citing In re Fegeley, 118 F.3d
27    979, 984 (3rd Cir. 1997)); see also In re Jacobs, 490 F.3d at 924 (state that the standard is
28    "knowledge and deliberateness," as opposed to inadvertence).

234. Whether a debtor acted "willfully" for purposes of Section 523(a)(1)(C) is a question of fact which must be determined in light of the totality of circumstances of the case, including all inferences to be drawn about debtor's state of mind based on his or her conduct. In re Spiwak, 285 B.R. at 750-51 (stating that circumstantial evidence of willfulness traditionally includes "(1) the recurrence of the understatement of income for more than one tax year, (2) the understatement of income, (3) implausible or inconsistent explanations of behavior, (4) inadequate records, (5) transfer of assets to a family member, (6) transfers for inadequate consideration, (7) transfer that greatly reduced assets subject to IRS execution, and (8) transfers made in the face of serious financial difficulties"); see also In re Klayman, 333 B.R. 695, 704 (Bankr. E.D. Pa. 2005); In re Hassan, 301 B.R. 614, 624 (S.D. Fla. 2003) (holding that a prior bankruptcy filing is relevant to willfulness determination).

235. The debtor may not establish the absence of the required intent by presenting evidence of offers in compromise filed with the IRS long after the debtor learned of the tax liability. For example, a debtor's belated attempt to compromise his federal tax debt did not prevent a Pennsylvania bankruptcy court from finding that the debtor had acted willfully to evade or defeat his taxes, requiring denial of discharge under 11 U.S.C. § 523(a)(1)(C). In re Klayman, 333 B.R. at 704. In the context of an unfiled tax return, the United States Court of Appeals for the Ninth Circuit has upheld the exception of debtor's tax liabilities from discharge under Section 523 where it found that debtors' cooperation with the IRS to resolve those debts was a "belated acceptance of responsibility" and "not an honest and reasonable attempt to comply with the requirements of the tax law." In re Hatton, 220 F.3d 1057, 1061 (9th Cir. 2000).

### i. *Duty to Pay and Knowledge of Duty*

236. It is undisputed that debtors had both a duty to pay taxes and knowledge of that duty. They readily acknowledged as much during their sworn testimony at trial, and they reported liabilities on their federal tax returns for each of the tax years at issue.

### ii. *Voluntary and Intentional Violation of Duty*

237. The preponderance of evidence adduced at trial, together with the inferences to be drawn therefrom, proves that debtors voluntarily and intentionally violated their duty to pay

-38-

1    taxes for purposes of § 523(a)(1)(C).  Among other evidence, the traditional circumstantial
2    evidence of debtors' willfulness in this regard includes:

3         (i)     understating their income in multiple tax years by failing to report gambling
4    winnings in 2000, 2002, and 2003, and overstating Jeffrey Swenson's business expenses in
5    2001 and 2002;

6         (ii)    proffering implausible and inconsistent explanations of their interest in the Club
7    Drive Residence, through which they have claimed approximately $129,000 in tax deductions;

8         (iii)   acquiring and enjoying assets held in the names of family members, including the
9    Club Drive Residence, thereby reducing their collection sources subject to IRS execution;

10        (iv)    acquiring and enjoying these assets in the face of serious financial difficulties;

11        (v)     failing to maintain adequate records;

12        (vi)    ignoring correspondence from the IRS and their tax return preparer;

13        (vii)   spending money that could have been used to pay their federal tax liabilities on
14   leisure activities instead, including heavy gambling, trips to Las Vegas, golf memberships, and a
15   $6000 Carribean cruise, among other things;

16        (viii)  offering $600 in August 2002 to settle their $700,000 income tax liability, yet
17   withdrawing nearly *five times* as much from ATM machines at Cal Expo – debtors' venue of
18   choice for gambling on horse races – between July 24, 2002, and September 24, 2002, alone;
19   and

20        (ix)    conspiring with defendants Warren Swenson and Vicky Senella to obstruct the
21   IRS's levy efforts.[3]

22        238.    The totality of debtors' conduct distinguishes them from the "honest, but
23   unfortunate" taxpayers for whom the bankruptcy discharge is reserved.  See Grogan, 498 U.S.
24   at 286-287.  This conclusion is particularly warranted in this case where debtors find themselves
25   in their second bankruptcy after continuing to accrue, and attempting to avoid, further tax
26   liabilities in the interim.  See In re Hassan, 301 B.R. at 624.

27

28        [3]     This was not the only time Warren Swenson facilitated his son's tax avoidance; he
     also obstructed the levy efforts of the California Franchise Tax Board.  See US EX. 38, FTB Letter;
     10/1 Trial Tr. at 211:15-17.

239.    Based on the preponderance of the evidence, the Court concludes that debtors have willfully attempted to evade or defeat the federal tax liabilities at issue in this case. Therefore, those tax liabilities are excepted from discharge pursuant to 11 U.S.C. 523(a)(1)(C).

**V.    Priority Federal Tax Claims [11 U.S.C. § 507(a)(8)]**

240.    The government's complaint in this case also seeks a determination, pursuant to 11 U.S.C. § 507(a)(8), that debtors' federal tax liabilities for tax years 2002, 2003, and 2004 constitute non-dischargeable priority tax claims because they concern taxable years for which a return was due within three years of the filing of debtors' bankruptcy petition.

241.    Debtors' bankruptcy petition was filed on September 28, 2005.  There is no dispute that debtors' federal tax liabilities for tax years 2002, 2003, and 2004 concern taxable years for which a return was due within three years of this date (*e.g.*, debtors' 2002 tax return was due on April 15, 2003).

242.    Therefore, debtors' federal tax liabilities for tax years 2002, 2003, and 2004 constitute non-dischargeable priority tax claims.

**VI.    Declaratory Judgment Claim that Club Drive Residence is Property of the Estate**

243.    The United States seeks, as part of its complaint in this case, to have the Club Drive Residence declared property of the bankruptcy estate.  The United States alleges that such relief should be granted because the Club Drive Residence is held by defendants Warren Swenson and Vicky Senella as nominees for debtors as debtors exclusively occupy, use, enjoy, and otherwise control the property.

244.    The use of nominees is a well-known device to conceal assets from the tax authorities.  See United States v. McGill, 964 F.2d 222, 230 (3d Cir. 1992).  Nominee status is determined by the degree to which a party exercises control over an asset.  See, e.g.,  LiButti v. United States, 107 F.3d 110, 119 (2nd Cir.1997); Shades Ridge Holding Co., Inc. v. United States, 888 F.2d 725, 728-29 (11th Cir.1989); United States v. Bell, 27 F.Supp.2d 1191, 1195 (E.D. Cal. 1998) (determining nominee status on summary judgment).  Courts have considered the following factors in determining whether a third party is a nominee with respect to property:

/ / / / /

1          (a) No consideration or inadequate consideration paid by the nominee;

2          (b) Property placed in the name of the nominee in anticipation of a suit or occurrence

3          of liabilities while the transferor continues to exercise control over the property;

4          (c) Close relationship between transferor and the nominee;

5          (d) Retention of possession by the transferor;

6          (e) Continued enjoyment by the transferor of benefits of the transferred property; and

7          (f) Failure to record conveyance;

8    Towe Antique Ford Found. v. IRS, 791 F.Supp. 1450, 1454 (D. Mont. 1992), aff'd, 999 F. 2d

9    1387 (9th Cir. 1993), citing United States v. Miller Bros. Constr. Co., 505 F.2d 1031 (10th

10   Cir.1974) (holding legal title holder was mere nominee of taxpayer); see also United States v.

11   Williams, 581 F.Supp. 756, 759 (N.D. Ga.1982) (holding the same).

12         245.   The United States has met its burden of proof, by a preponderance of the

13   evidence, that debtors are the actual, beneficial owners of the Club Drive Residence, and that

14   Warren Swenson and Vicky Senella hold title to the property merely as their nominees.

15         **A.     *No Consideration or Inadequate Consideration Paid by Nominees***

16         246.   Warren Swenson and Vicky Senella paid little or no consideration for the right to

17   hold title to the Club Drive Residence.

18         247.   First, Warren Swenson and Vicky Senella have not put any equity of their own into

19   the Club Drive Residence because the purchase price was 100% financed, and debtors have

20   been responsible for paying the mortgage, property insurance, and property taxes at all relevant

21   times since the property was acquired (in the form of payments to Warren Swenson or the

22   lender(s) directly).  Warren Swenson admits that he has no equity in the property.

23         248.   Second, the only expense associated with the purchase of the Club Drive

24   Residence was approximately $3000 for the closing costs.  Although this *de minimis* amount

25   was withdrawn from Warren Swenson's business account (which is held in his wife's name), all

26   of Jeffrey Swenson's earnings flow through this account; thus, it is more likely than not that

27   debtors paid the closing costs in the form of a deduction from Jeffrey Swenson's paycheck.

28         249.   Third, debtors have borne all of the costs associated with the maintenance, repair,

and general upkeep of the Club Drive Residence.

-41-

**B.   Property Placed in the Name of Nominees in Anticipation of a Suit or Occurrence of Liabilities**

250.   Warren Swenson and Vicky Senella acquired title the Club Drive Residence on debtors' behalf in September 1999.  At that time, debtors were facing approximately $500,000 in federal income tax liabilities, including $180,000 in audit assessments by the IRS in February and April of 1999, and a self-assessed liability of approximately $118,000 for tax year 1998. Debtors were also under audit by the California Franchise Tax Board during this same time period.

**C.   Close Relationship between Debtors and Nominees**

251.   There is no dispute that debtors are closely related to Warren Swenson and Vicky Senella in multiple respects.  Warren Swenson is debtor Jeffrey Swenson's father and full-time employer.  Vicky Senella is debtor Vicky Senella's sister, and also debtor Jeffrey Swenson's step-mother.

**D.   Retention of Possession by Debtors**

252.   There is no dispute that debtors have maintained exclusive possession of the Club Drive Residence since the property was acquired in 1999.

**E.   Continuous Enjoyment & Control of Property by Debtors**

253.   Debtors have continuously enjoyed and otherwise controlled the Club Drive Residence since its acquisition.

254.   Debtors have been responsible for paying the mortgage, property insurance, and property taxes for the Club Drive at all relevant times (either to Warren Swenson or directly to the lender(s)).

255.   Debtors have been responsible for making all necessary repairs to the property.

256.   Debtors have been responsible for maintaining the pool, which they have done with the assistance of a pool man, and the landscaping.  See 10/2 Trial Tr. at 9:6-9.

257.   Debtors claimed home mortgage interest and state property tax deductions for the Club Drive Residence on their tax returns during tax years 2000, 2001, 2002, 2003, and 2004, thereby reducing their taxable income.  Debtors' property deductions in this regard totaled approximately $129,000.

1    258.   Debtors' reporting of home mortgage interest and property tax deductions is an

2    admission of ownership, as is their reporting of Warren Swenson as the person from whom they

3    bought the home.  See, e.g., Powell v. Commissioner, 256 F.2d 941, 944 (5th Cir. 1958) (holding

4    that matters reported on federal tax returns constitute admissions by taxpayers); Grill v. United

5    States, 303 F.2d 922, 926 (Ct. Cl. 1962); McShain v. Comm'r, 71 T.C. 998, 1010 (1979).

6    259.   Debtors' ownership and control of the Club Drive Residence is corroborated by

7    Warren Swenson's representations to this effect to his longtime tax return preparer, Gary Wurst,

8    shortly after the acquisition of the property.

9    260.   Based on the preponderance of the evidence, the Court concludes that Warren

10   Swenson and Vicky Senella hold title to the Club Drive Residence as debtors' mere nominees.

11   Therefore, the Club Drive Residence constitutes property of the bankruptcy estate, by operation

12   of 11 U.S.C. § 541(a)(1), and title to the property shall be corrected to properly reflect debtors'

13   ownership thereof.

14   **VII.    Injunctive Relief to Prevent Transfer of Club Drive Residence**

15   261.   As part of its complaint in this case, the United States seeks to enjoin defendants

16   Warren Swenson and Vicky Senella from selling, encumbering, or otherwise dissipating the

17   Club Drive Residence."  Compl. at ¶ 28.

18   262.   In accordance with this Court's conclusion that the Club Drive Residence

19   constitutes property of debtors' bankruptcy estate, and in light of the irreparable injury that could

20   result to the creditors in this case in the absence of such an injunction, defendants Warren

21   Swenson and Vicky Senella are hereby enjoined from taking any action with respect to the Club

22   Drive Residence pending further instructions from this Court.

23

24   **IT IS SO ORDERED.**

25   DATED this ____ day of _____, ~~2007~~. 2008

26

27

28                                          RICHARD T. FORD
                                            U.S. Bankruptcy Judge

-43-